***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments of the parties. Neither party has shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for minor modifications.
 *********** EVIDENTIARY MATTERS
At the hearing before the deputy commissioner, defendants submitted a Letter of Termination from defendant-employer to plaintiff, which was admitted into the record over Plaintiff's Objection, and marked as Defendants' Exhibit (1).
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, which was admitted into the record, and marked as Stipulated Exhibit (1) as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, which has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. On 12 November 2001, an employment relationship existed between plaintiff and defendant-employer.
4. On 12 November 2001, defendant-employer was insured by defendant-carrier, The Hartford.
5. Plaintiff's average weekly wage on the relevant dates herein is to be determined by an Industrial Commission Form 22 Wage Chart.
6. Subsequent to the hearing before the deputy commissioner the deposition of Dr. David Baker was offered and received into the evidence of record.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, plaintiff was forty-seven (47) years of age, with her date of birth being 18 March 1955. Plaintiff is approximately 5'3" in height, and weighs approximately two hundred and seventy-five (275) pounds. Plaintiff is right hand dominant. Plaintiff graduated from high school, and received an Associates Degree in Medical Assistance.
2. Prior to working for defendant-employer, plaintiff worked in a temporary position as a medical transcriptionist for Carolina Orthopedics for approximately three months. Plaintiff also worked for Southpoint Family Practice as a medical transcriptionist for four years, and for Dr. Bruce Wallace as clinical assistant for approximately four months.
3. Plaintiff was employed by defendant-employer as a medical transcriptionist. In that capacity, plaintiff's duties consisted of typing physicians' dictation along with transcribing correspondence and tests results. These duties required plaintiff to type approximately seven hours per day. While working for defendant-employer, plaintiff earned $13.00 per hour.
4. Plaintiff's medical history includes being diagnosed with diabetes and hypertension. Additionally, prior to beginning her employment with defendant-employer, plaintiff experienced problems with her hands while working for Southpoint Family Practice. For her symptoms, plaintiff was given a wrist splint and prescribed Ibuprofen. At the hearing before the deputy commissioner, plaintiff testified that these prior hand symptoms had resolved by the time she began working for defendant — employer.
5. In the late spring and early summer of 2001, plaintiff began experiencing numbness and tingling in her hands while working for defendant-employer. The numbness began in plaintiff's left hand, and spread to other parts of her body. Plaintiff testified to also experiencing pain in her neck and arms. In August 2001, plaintiff testified that her symptoms had become unbearable, and that she had to sleep while sitting because of the pain and swelling. After a period during which plaintiff attempted to self-medicate her symptoms, she sought medical attention from Dr. Gregory Glass, her family physician in November 2001. Dr. Glass then referred plaintiff to Dr. Doute, an orthopaedic specialist, who gave her samples of Vioxx and ordered x-rays of her cervical spine. Plaintiff testified that at the time she was examined by Dr. Doute, she was experiencing throbbing and pain in her neck, and a burning radiating pain in her shoulder and arm. The medical records from plaintiff's treatments with Dr. Glass and Dr. Doute were not offered as evidence in this case.
6. In February 2002, plaintiff was examined by Dr. Robert Geidraitis. According to plaintiff's testimony, when her health insurance changed so that treatments by Dr. Geidraitis were no longer covered, she changed to Dr. David Baker at the Miller Clinic. The medical records from plaintiff's treatments with Dr. Geidraitis were not offered as evidence in this case.
7. Plaintiff was initially examined by Dr. Baker on 13 March 2002. At that time, plaintiff reported having experienced numbness and tingling in her hands for some time that had intensified over the preceding three months, along with mild neck pain. Following his examination, Dr. Baker diagnosed plaintiff as having bilateral carpal tunnel syndrome for which he initially attempted to treat with a cortisone injection. When plaintiff experienced little relief from the injection, Dr. Baker performed a right carpal tunnel release on 17 April 2002, and a left carpal tunnel release on 9 May 2002. Subsequent to these procedures, plaintiff reported an improvement with her symptoms.
8. On 19 June 2002, plaintiff reported to Dr. Baker that she was pleased with her progress and had only minimal complaints. On that date, Dr. Baker released plaintiff from his care and opined that her symptoms would continue to improve.
9. Dr. Baker has opined that plaintiff's job with defendant-employer was a significant contributing factor in the development of her bilateral carpal tunnel syndrome although did note other contributing factors. Additionally, Dr. Baker has opined that plaintiff's duties and employment with defendant-employer increased her risk of developing her carpal tunnel syndrome.
10. Approximately two months after her second surgery, plaintiff testified that she developed symptoms with her thumb, however she did not seek additional medical treatment until 15 January 2003. On that date, plaintiff returned to Dr. Baker, and reported that she was there for a re-evaluation. Dr. Baker examined plaintiff, and diagnosed her as having trigger finger syndrome or stenosing tenosynovitis, for which he presented three treatment options, medications, injections and surgery. Dr. Baker has testified that people who develop carpal tunnel syndrome as a result of repetitive motion work, are also more likely to develop other repetitive motion diseases such as stenosing tenosynovitis. However, Dr. Baker did not offer an opinion to a reasonable degree of medical certainty as to whether plaintiff's stenosing tenosynovitis was related to her employment with defendant-employer or to her carpal tunnel syndrome.
11. On 1 April 2002, plaintiff was notified by defendant-employer that her job was being eliminated and she was given a thirty notice. Credible evidence was presented that plaintiff's job was eliminated because defendant-employer was taking its transcription work to an outside contractor, and no longer needed plaintiff to perform her those duties. Plaintiff's last day of employment with defendant-employer was 30 April 2002. Plaintiff was not under any work restrictions at the time her job was eliminated, and no evidence was presented to establish that defendant-employer had knowledge of her workers' compensation claim at the time the decision to eliminate her position was made. Plaintiff was given an opportunity to interview with or find employment with the outside transcription service, which was looking for employees at that time. However, plaintiff did not to pursue that route, and testified that she made that decision based upon her ongoing symptoms in relation to repetitive motion work.
12. Plaintiff was last injuriously exposed to the hazards of contracting bilateral carpal tunnel syndrome while working for defendant-employer.
13. Plaintiff's job with defendant-employer caused or significantly contributed to the development of her bilateral carpal tunnel syndrome. Additionally, plaintiff's job with defendant-employer increased her risk of developing bilateral carpal tunnel syndrome as opposed to members of the public not so employed.
14. The evidence of record is insufficient upon which to find that plaintiff's stenosing tenosynovitis was related to her employment with defendant-employer or to her carpal tunnel syndrome.
15 From 30 April 2002, when she last worked for defendant-employer, through
19 June 2002, when she was released by Dr. Baker, plaintiff was unable to earn any wages in any employment as the result of her occupational disease, bilateral carpal tunnel syndrome.
16. The evidence of record is insufficient upon which to find that any disability plaintiff had subsequent to 19 June 2002 was related to her employment with defendant-employer or her carpal tunnel syndrome.
17. At the time of the filing of this Opinion and Award, plaintiff had not been assigned a permanent partial disability rating for her bilateral carpal tunnel syndrome.
18. Plaintiff's average weekly while working for defendant-employer was $555.00, yielding a compensation rate of $370.18.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage while working for defendant-employer was $555.00, yielding a compensation rate of $370.18. N.C. Gen. Stat. § 97-2(5).
2. Plaintiff was last injuriously exposed to the hazards of contracting bilateral carpal tunnel syndrome while working for defendant-employer. N.C. Gen. Stat. § 97-57.
3. Plaintiff's job with defendant-employer caused or significantly contributed to the development of her bilateral carpal tunnel syndrome. Additionally, plaintiff's job with defendant-employer increased her risk of developing bilateral carpal tunnel syndrome as opposed to members of the public not so employed. The evidence of record is insufficient upon which to conclude that plaintiff's stenosing tenosynovitis was related to her employment with defendant-employer or to her carpal tunnel syndrome. N.C. Gen. Stat. § 97-53(13).
4. As the result of her occupational disease bilateral carpal tunnel syndrome, plaintiff is entitled to be paid by defendants total disability compensation at the rate of $370.18 per week for the period of 30 April 2002 through 19 June 2002. N.C. Gen. Stat. § 97-29. The evidence of record is insufficient upon which to conclude that any disability plaintiff had subsequent to 19 June 2002 was related to her employment with defendant-employer or her carpal tunnel syndrome. N.C. Gen. Stat. §§ 97-2(9), 97-29.
5. As the result of her occupational disease bilateral carpal tunnel syndrome, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred. N.C. Gen. Stat. §§ 97-25;97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff total disability compensation at the rate of $370.18 per week for the period of 30 April 2002 through 19 June 2002. Having accrued, this compensation shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved herein.
2. Defendants shall pay for all related medical expenses incurred or to be incurred as the result of her occupational disease bilateral carpal tunnel syndrome.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded in Paragraph 1above is hereby approved to be deducted from the lump sum due plaintiff and shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the 17th day of December 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER